UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS HUERTA IBARRA,<br><br>         Petitioner,<br><br>    v.<br><br>EDWARD S. ALAMEIDA, JR.,<br><br>         Respondent. | 1:04-CV-05589 OWW GSA HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented in this action by George A. Boyle, Esq.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on November 2, 2000, of two counts of continuous sexual abuse by a resident in violation of Cal. Penal Code § 288.5(a), and 42 counts of lewd or lascivious acts upon a child under 14 in violation of Cal. Penal Code § 288(a). See Lodged Doc. No. 4.[1]  Petitioner was sentenced to serve a total term of 90 years in state prison. Id.

Petitioner appealed his conviction to the California Court of Appeals, Fifth Appellate District

---

[1] "Lodged Doc." refers to the documents lodged by Respondent with his answer.

(hereinafter "Fifth DCA"). On July 19, 2002, the Fifth DCA reversed the convictions in counts 2-15 and 40-44, and remanded the matter for resentencing. Id. Following remand, the superior court resentenced Petitioner to a term of 62 years in state prison which was affirmed by the Fifth DCA on November 6, 2003. See Lodged Doc. No. 5.

Petitioner filed a petition for review on August 19, 2002. See Lodged Doc. No. 6. The petition was summarily denied on September 25, 2002. See Lodged Doc. No. 7.

Petitioner then filed three petitions for writ of habeas corpus in the Kern County Superior Court as follows: 1) Filed: August 18, 2003, Denied: October 8, 2003; 2) Filed: September 23, 2004, Denied: November 16, 2004; 3) Filed: October 5, 2004; Denied: December 1, 2004. See Lodged Docs. Nos. 8-13.

On January 24, 2005, Petitioner filed a petition for writ of habeas corpus in the Fifth DCA. See Lodged Doc. No. 14. The petition was summarily denied on August 26, 2005. See Lodged Doc. No. 15.

On November 7, 2005, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. See Lodged Doc. No. 16. Petitioner filed a second petition for writ of habeas corpus in the California Supreme Court on November 18, 2005. See Lodged Doc. No. 18. On August 23, 2006, both petitions were summarily denied. See Lodged Docs. Nos. 17, 19.

On March 24, 2004, Petitioner filed the instant petition for writ of habeas corpus in the Sacramento Division of the United States District Court for the Eastern District of California. By order of the Court dated April 19, 2004, the matter was transferred to the Fresno Division. Petitioner raises the following two (2) claims for relief: 1) He claims the trial court improperly admitted a witness' prior inconsistent statement on the basis that the witness' lack of recollection was feigned; and 2) He alleges the prosecutor committed misconduct by arguing punishment to the jury. Petitioner was initially granted a stay of the petition pending exhaustion of state remedies with respect to certain other claims. However, on May 15, 2007, due to repeated failures to comply with the Court's orders and time deadlines, and for improperly attempting to present additional claims in direct contravention of the Court's order granting a stay, the Court vacated the stay and ordered the case proceed on the original petition. Respondent filed an answer on September 19, 2007. Petitioner did

not file a traverse.

# FACTUAL BACKGROUND

The Court hereby adopts the factual summary set forth by the appellate court in its opinion of July 19, 2002:

**The Household of Esther C.**

[Petitioner], whose nickname was "Chuy," was a longtime friend of Esther C. and her boyfriend, Jesus. In 1996, [Petitioner] rented a bedroom in their Bakersfield home. He moved out at one point but moved back in August 1998 after Jesus had left the premises. Within a few months, [Petitioner] became Esther's new boyfriend.

Esther and [Petitioner] lived with Esther's four children, victims Nancy S. (age 14 at time of trial), Erika S. (age 11 at time of trial) and two younger boys. A fifth child, [Petitioner]'s daughter, was born to Esther in March 2000, and also lived with the family. Esther's niece, Rosa C., generally lived in Orange County with her mother, Angelica. In 1996, Angelica sent Rosa and her two brothers to live with Esther while Angelica was going through a marital dissolution. The children stayed with Esther through October 1999. Rosa also visited Esther during vacations in December 1999 and March 2000. Rosa was eight years old at the time of trial.

During most of the time [Petitioner] lived with Esther, there were seven children in the household. [Petitioner] had his own room in the three-bedroom residence.

**Instances of Lewd and Lascivious Conduct**

In 1996, [Petitioner] was living with his sister Celia. Esther's elder daughter, Nancy, spent time at Celia's home. When then 10-year-old Nancy went to the kitchen for some water before going to bed, [Petitioner] came up to her, held her tight, and kissed her. The prosecution charged this conduct as count 39. On five to ten occasions, [Petitioner] visited Esther at home and grabbed and kissed Nancy the same way when no one was looking.[2]

After [Petitioner] moved into Esther's home in August 1998, he fondled Nancy, Erika, and Rosa. [Petitioner] had a television set in his bedroom and the children occasionally sat on the bed and watched programs. Sometimes Nancy would come in to watch the television by herself. [Petitioner] would enter the room, pretend to get something, and then kiss her (count 44). In later encounters, the fondling escalated. On 10 to 18 occasions, [Petitioner] touched Nancy's breasts and vagina with his hands. At first he touched over her clothes (counts 40 [breasts] and 41 [vagina].) In later incidents he would touch under her clothing (counts 42 [breasts] and 43 [vagina].)

On other occasions Erika or Rosa, or both, would go to [Petitioner]'s room to watch television. If Rosa was present when [Petitioner] wanted to touch Erika, he would tell Rosa to stand watch at the door and then have Erika pull down her pants. He touched his hand to Erika's vagina at least 10 times (count 3) and also touched her buttocks (count 6). On five occasions, [Petitioner] placed his mouth on Erika's vagina (counts 11-15). On two occasions he placed his penis on her vagina without penetration (counts 4-5). On two or three occasions he placed his fingers in Erika's vagina, causing some pain (counts 9-10). According to Rosa, on two or three occasions [Petitioner] lay atop Erika in the bedroom and engaged in "sex"

---

[2] These incidents were not charged.

while both were fully clothed. [Petitioner] kissed Erika's breasts two or three times.[3] On one occasion, Erika and Rosa took a shower together. [Petitioner] entered the bathroom and kissed Erika's breasts (count 8). On another occasion, he touched Erika's breasts with his hand (count 2).

[Petitioner] also touched Rosa when she was six or seven years old. Sometimes this occurred while [Petitioner] had Erika stand guard at the door, but it usually took place when Rosa was alone with [Petitioner]. On more than five occasions, [Petitioner] pulled down Rosa's pants and touched his penis to her buttocks, but without significant penetration (counts 24-28). [Petitioner] rubbed his penis against her vagina on several occasions but those incidents were not charged. [Petitioner] placed his penis in her mouth and had her orally copulate him five times (counts 16-20). On another occasion, [Petitioner] had Rosa fondle his penis in the living room (count 36). When Rosa and Erika were in the shower, he came in and put his mouth to Rosa's breasts (count 22). Rosa said [Petitioner] lay atop her twice in the bathroom and once in his bedroom and he "did like sex."

Rosa said [Petitioner] moved his hips up and down while both were clothed (counts 21, 23, and 37). On five occasions he rubbed his hand against her vagina while she was unclothed but did not engage in penetration (counts 31-35). On another occasion, [Petitioner] drove some of the children to the video store, realized he had forgotten his card, and had to return home. He took Rosa with him while the other children stayed in the video store. On the way back to the store, [Petitioner] parked the car and had Rosa fondle his penis (count 30). He also lay atop her and "did like sex" (count 29).

**Discovery and Investigation**

In August 1999, Nancy, Erika, and Rosa told Esther that [Petitioner] had been improperly touching them. Esther spoke to each girl and then to [Petitioner] separately about the allegations. Esther testified she asked [Petitioner] to move out of the house. She also warned the girls to stay away from him until he did so. He nevertheless remained in the house until his arrest in May 2000. When police interviewed Esther in May 2000, she said she tried to keep an eye on [Petitioner] after the girls accused him. However, she did not say she had asked him to move out.

Rosa moved back with her mother, Angelica, in October 1999. She returned to Esther's home for a visit during Christmas vacation of that year. When she came back home, she told Angelica for the first time that [Petitioner] had molested her. Angelica telephoned Esther and told her about Rosa's accusation. When Esther said she did not believe it, Angelica threatened, "If you don't do nothing about it, I'm going to call the cops."[4]

In May 2000, Angelica telephoned the Kern County Child Protective Services Department (CPS) and reported Rosa's accusation. CPS referred the case to the Bakersfield Police Department. Police Detective Richard Herman interviewed Nancy, Erika, and Esther and then arrested [Petitioner].

**[Petitioner]'s Confession**

After arriving at the station with [Petitioner], Detectives Richard Herman and Herman Caldas interviewed [Petitioner] in an interrogation room. [Petitioner] initially denied any

---

[3] This was another uncharged incident.

[4] Rosa went back to Esther's house in March 2000, but this time without Angelica's consent. Angelica was in jail at the time Rosa returned to Esther's home.

improper contact. When Detective Herman suggested that [Petitioner]'s response was "unbelievable," [Petitioner] "eventually changed his story somewhat and said that Nancy had been coming on to him recently." However, [Petitioner] continued to deny any improper contact. When the detective challenged him again, [Petitioner] said Nancy provoked him on two occasions and he had placed his hands on her breasts while pushing her away.

He also said that Rosa and Erika had acted provocatively by dancing in front of him and brushing their hands against his groin. On one occasion, he touched Erika's crotch out of anger because she had often done that to him. The detective again labeled [Petitioner]'s statement as "unbelievable" and asked him how he thought "these kids felt having to go through all of this." [Petitioner] began to sob and said, "I have big problems. Can you help me?" The detective told him, "I would do everything that I could." At that point [Petitioner] admitted, "I did everything they say I did" and claimed he had been abused as a child.

[Petitioner] specifically admitted kissing Nancy at his sister's house and at other times (counts 39 and 44) and touching her breasts and vagina both over and under her clothing (counts 40-43). He said he had touched and digitally penetrated Erika's vagina "several times" (counts 3, 9, 10). He also said he had touched his penis to her vagina at least once (count 4) and that he had kissed her breasts and vagina "a few times" (counts 8, 11-15). With respect to Rosa, he admitted "he had done the same things to both of them [Rosa and Erika] at the same time."

At this point, Detective Herman decided to record [Petitioner]'s statement. He left the interrogation room for a few moments to activate the recorder. While Herman was gone, Detective Caldas saw [Petitioner] was crying. Caldas asked [Petitioner] if he wanted to write "letters of apology" to the three girls. [Petitioner] agreed and wrote three brief letters (People's exh. Nos. 3-5), stating:

"Nancy, this is Chuy. You know that you [will] always be my baby. I want to tell you that I feel so sorry for kissing you and touching your vagina. Jesus Huerta."

"Rosa, this is Chuy. I want to tell you that I feel so sorry for the bad things I did to you, for molesting you and touching your private parts. You know that I always love you and I wish you to be [a] happy little girl. Jesus Huerta. 5-22-00."

"Erika, I want you to p[a]rdon me for anything I did to you, for touching you with my pene [Spanish for penis] and touching your bra. Sorry, Erika. Jesus Huerta. 5-22-00."

In the taped portion of the interview, [Petitioner]'s admissions were more limited. [Petitioner] said he had touched both Erika and Rosa, sometimes together and sometimes separately. On one occasion he kissed Erika on the breasts while she was in the shower. According to [Petitioner], Erika had called to him to bring her a towel and then asked him to kiss her breasts. He denied ever digitally penetrating Erika's vagina. However, he had touched her vagina with his penis on one occasion. [Petitioner] claimed this was also at Erika's request. [Petitioner] said Erika pulled her pants down in his bedroom, grabbed him, and said, "Let's get some sex." [Petitioner] said he rubbed his penis on the outside of her vagina for half a minute but did not ejaculate. On the same occasion, he put his mouth to her vagina. [Petitioner] said this was again at Erika's request. On two separate occasions he touched her vagina, including once in the living room.

[Petitioner] said he touched Rosa's vagina with his fingers once in the living room, on the same occasion that he had done so with Erika. He said he touched Nancy three times on her breasts and once on her vagina. The latter incident took place in the living room.

**Prior Act of Misconduct Involving Another Victim**

The prosecution presented evidence of an earlier incident involving someone outside of Esther and Angelica's family. In 1992, 13-year-old Tina C. was getting ready for bed and heard her bedroom window slide open. The window was on the ground floor and accessible from the street. [Petitioner] was standing at the window, calling her name. She had seen [Petitioner] in the area of her home in 1992 and identified him in court at trial. [Petitioner] told Tina he wanted her to be his girlfriend and invited her to "go to his apartment and to sleep with him." Tina got scared, went to her mother in another room, and told her what was taking place. Tina's mother told her to go back to her room as if she were going to bed. A short time later, Tina's mother entered the bedroom with a baseball bat. [Petitioner] apparently became frightened and ran away.

**Defense**

At trial, [Petitioner] denied ever touching any of the girls in a sexual manner. Erika told police "it hurt" when [Petitioner] digitally penetrated her vagina on two or three separate occasions. John L. Digges, M.D, a forensic pediatrician, and Mark Stevens, M.D., an emergency room physician, both examined Erika. According to Dr. Digges, digital penetration of a girl starting puberty, like Erika, could cause tissue separation. Such separation "would almost always be associated with some pain," although not as much pain as if the victim were pre-estrogenized. Neither Digges nor Stevens found any tearing or other abnormality suggesting abuse.[5]

Both Nancy and Erika recanted their accusations against [Petitioner]. On May 24, 2000, two days after [Petitioner]'s arrest, Erika told Dr. Stevens she had not been improperly touched by anyone. Erika testified at trial that [Petitioner] had never abused her and that she had lied to Detective Herman. Nancy also testified that [Petitioner] had never touched her improperly. She said she lied to Detective Herman. The girls claimed they made up the story about abuse because they wanted [Petitioner] out of the house.[6]

Rosa did not recant her accusations but admitted she had been molested by another male. Rosa and her brother had been staying with Esther in Bakersfield. When they returned home to Santa Ana, the brother molested Rosa. On one occasion, the brother rubbed Rosa's vaginal area so hard that Angelica noticed the bruise and confronted her. At that point, Rosa admitted her brother had committed the abuse. However, she denied the brother molested her while they were living in Bakersfield.

Both Rosa and Erika had watched pornographic videos. According to Erika, while the children lived in Bakersfield, Rosa's brother put on a pornographic video and Rosa and others

---

[5] Dr. Digges also stated he could not rule out sexual abuse because "sexual abuse can certainly occur in instances where the findings are absolutely normal." Digges said a traumatic injury causing pain might have healed by the time he saw the patient.

[6] Bakersfield psychologist Michael Musacco, Ph.D., an expert in "child sexual abuse accommodation syndrome," testified it is "not uncommon" for a victim to recant, particularly where the parent is not supportive. According to a school activity leader in whom Erika confided, Erika admitted the molestation but expressed concern that [Petitioner] would be sent to prison for a long time. Erika told the leader that [Petitioner] had called her from jail. [Petitioner] said Erika's half-sister (the baby Esther and [Petitioner] had together) would be deprived of a father and that the accusations were ruining his life and the baby's life. Both Erika and [Petitioner] denied there had been any such call. Erika denied telling the activity leader of any such call. Erika claimed she merely restated to the leader the same false accusations she had made to Detective Herman. Erika recanted her accusations on May 24, 2000, just two days after [Petitioner]'s arrest and several weeks before she met with the activity leader.

watched the video. Esther discovered them and took out the video. Rosa denied being in the audience and admitted only to watching such a video when she returned to Santa Ana. Rosa attended a school in Anaheim even though she lived in Santa Ana. According to Rosa, Angelica trained her to lie to school officials about her true residence.

[Petitioner] testified his confession to the police was the result of promises of lenient treatment if he admitted the allegations and threats of harsh punishment if he did not. He stated:

"[Detective Herman] told me that if I did not tell him that I had touched the girls, that he would put me in jail for life, and that the prisoners at jail would probably kill me. Also, that he was going to take the children away from Esther, and that I would never see my little girl ever again. [¶] . . . [¶]

"He said that if I accepted the charges, that he would allow me to go home; that I was not arrested; that I did not have the handcuffs on; that he was just going to give me probation or send me to a school. I don't know what kind of school. I was very convinced of what they were saying to me they said for me to make a choice, a preference."[7]

See Lodged Doc. No. 4 at 3-11.

## DISCUSSION

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

---

[7]Detective Herman denied making such threats or promises.

U.S. District Court
E. D. California      cd                                    7

## II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III. Review of Petitioner's Claims**

**A. Ground One**

In his first claim for relief, Petitioner alleges the trial court erred by improperly admitting witness Rosa's prior inconsistent statement. He alleges the trial court improperly allowed the statement on the basis that Rosa's lack of recollection was feigned.

This claim was presented on direct appeal to the Fifth DCA and rejected in a reasoned opinion. See Lodged Doc. No. 4. The claim was then presented to the California Supreme Court in a petition for review and was summarily denied on September 25, 2002. See Lodged Docs. Nos. 6, 7. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Fifth DCA stated:

In the instant case, the trial court saw Rosa's demeanor while she testified about her

> treatment at the hands of [Petitioner]. From that demeanor evidence, the trial court could have reasonably determined that Rosa was being purposefully evasive and feigning a lack of recollection in her testimony. For purposes of ruling on the admission of Rosa's statements to Detective Herman as prior inconsistent statements, the trial court was the sole and exclusive judge of Rosa's credibility as determined by her demeanor on the witness stand. (*Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140.) As noted above, the power to judge the credibility of a witness, resolve any conflicts in the testimony, weigh the evidence, and draw factual inferences is vested in the trial court. On appeal all presumptions favor the exercise of that power and the trial court's findings on such matters, whether express or implied, must be upheld if supported by substantial evidence. (*People v. Leyba, supra,* 29 Cal.3d at pp. 596-597.)
>
> In our view, the trial court implicitly determined that Rosa was evasive in her testimony, the record supports such an inferential finding, and thus the trial court properly admitted her prior inconsistent statements to Detective Herman.

See Lodged Doc. No. 4 at 21.

Respondent correctly argues that this issue does not present a federal claim. Admission of the witness' statement is an evidentiary issue that was addressed under California law. Generally, issues of state law are not cognizable on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). Moreover, "incorrect" evidentiary rulings are not the basis for federal habeas relief  Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.1990), *cert. denied*, 498 U.S. 1091 (1991). In addition, federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). Therefore, this allegation should be dismissed for failure to present a cognizable federal claim for relief.

In any case, there is no merit to Petitioner's claim. The trial court viewed firsthand the demeanor of the witness and determined the witness' lack of recollection was feigned. There is nothing in the record to show this finding was anything but reasonable.

**B.  Ground Two**

In his second and final claim for relief, Petitioner alleges the prosecutor committed misconduct during closing argument when she mentioned possible punishment of Petitioner.

During the prosecutor's opening remarks, she stated:

| | |
|---|---|
| 1 | Some of you, one of you, may look at defendant, not with the disdain that I view him with, which is probably obvious by my questioning of him. You may feel he's sick. He does need help, assuming that you believe he was molested as a child, and that is some sort of excuse for him doing it as an adult. |
| 2 | |
| 3 | |
| 4 | The only thing I want to comment about that is this, just really by way of reminder. Those issues of whether or not he does need help, that's not for you to decide. That's not your job today or tomorrow, however long it takes you during deliberations. Do you know whose job that is? That's Judge Friedman's job, and he only gets to it if you find the defendant guilty of some or all of these crimes. That's Judge Friedman's job to decide that. |
| 5 | |
| 6 | |
| 7 | See Lodged Doc. No. 4 at 21-22. |
| 8 | After the prosecutor concluded her closing argument, the following exchange took place: |
| 9 | MR. KINNISON [deputy public defender]: I'm going to register an objection to certain portions of the prosecutor's argument. I've already made one, and I'd like to mention a second objection with regards to the latter portion of her argument, wherein she suggested to the jury that my client is ill, mentally ill or sick, and unless they find him guilty of these charges, he's not going to be able to get the help that he needs. |
| 10 | |
| 11 | |
| 12 | THE COURT: The treatment? |
| 13 | MR. KINNISON: That, to me, suggest that she's asking them to find him guilty because that's the only way he's going to get the help that he needs. So, in other words, if they simply find that he did - - he was molested as a child, he's sick, he needs help, and the only way to get that help is to convict him of these, regardless of whether or not they're proven. [¶] So I'd cite misconduct to that, as well as my previous objection, and move for a mistrial. |
| 14 | |
| 15 | |
| 16 | THE COURT: Ms. Green? |
| 17 | MS. GREEN [deputy district attorney]: Well, the objection is not timely. I find it very curious how Mr. Kinnison is registering this objection now that his supervisor, Mr. Ulman, sat in the courtroom through my entire argument, came up to speak with Mr. Kinnison after the argument was over, as I was walking out of the courtroom. [¶] So my first response is that Mr. Kinnison's objection is not timely . . . . [¶] . . . [¶] |
| 18 | |
| 19 | |
| 20 | The second objection what I said is a fair comment on the evidence, because the evidence is that the defendant said twice during the trial - - the evidence was the defendant said that he needs help, 'Can you help me?' So that's an issue that's before this jury. I never, ever suggested in anything I said that their burden was anything less than beyond a reasonable doubt . . . |
| 21 | |
| 22 | |
| 23 | . . . What I was just basically doing is emphasizing the instruction that punishment or what happens to the defendant - - |
| 24 | THE COURT: [CALJIC No.] 17.42. |
| 25 | MS. GREEN: - - is not their concern, it's Your Honor's concern, and I was just emphasizing that. And I think his position is not well taken at all, and I would not ask the Court at this time to admonish the jury in any way based on what I said. It was appropriate . . . . |
| 26 | |
| 27 | THE COURT: Counsel? |
| 28 | MR. KINNISON: Your Honor, there are well known limits to the kinds of things that are |

> allowed in an argument, and simply to allow the prosecutor carte blanche given the opportunity to respond in argument, is not what the Court's held, and I think in this case, this is one of those cases where the line was stepped over . . . .
>
> THE COURT: The Court, having obviously heard the argument, finds that the objection is not timely, but even if it was, I do not find that there was misconduct and find that there was not an appeal to prejudice or sympathy or passion on the part of the jury.
>
> The comment was fair, based on the evidence. It's a fair comment. I don't feel that an admonition is appropriate at this point in time. 17.42 will be given to the jury at the end of the case. I believe Ms. Green also indicated the issues of penalty or punishment or treatment or what have you are matters for the Court, if and when we get to that point. [¶] So I'll deny the motion.

See Lodged Doc. No. 4 at 22-23.

As with his first claim, this claim was presented on direct appeal to the Fifth DCA where it was rejected in a reasoned opinion. It was then presented to the California Supreme Court in a petition for review where it was summarily denied. The California Supreme Court is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. Ylst, 501 U.S. at 803.

In rejecting the claim, the Fifth DCA found no misconduct by the prosecutor. The appellate court stated:

> At trial, Detective Richard Herman testified that [Petitioner] said, "I have problems. I have big problems. Can you help me?" Detective Herman told [Petitioner] he would do everything he could. [Petitioner] then said, "I did everything they [the children] say I did." [Petitioner] also told Herman he had been molested and sodomized as a child in Mexico. The abuse occurred on a ranch in Mexico and a ranch worker was the abuser. [Petitioner] also described his feelings when he engaged in the sexual offenses charged in the instant case. According to Herman, "[H]e [Petitioner] gets urges, and as the urges grow or become more intense, he eventually molests the child, and then feels very bad about it immediately thereafter." On May 22, 2000, [Petitioner] wrote letters of apology to Nancy, Rosa, and Erika. In each letter, [Petitioner] expressed remorse and offered his apologies for touching the minor's anatomy.
>
> The prosecutor's challenged comment did not relate to the severity of the disposition in the case or encourage the jurors to render a guilty verdict so that [Petitioner] might obtain psychological help. Rather, the prosecutor simply conveyed the essence of CALJIC No. 17.42, an instruction subsequently given by the trial court. The prosecutor reminded the jurors that the subject of penalty or punishment must not in any way affect their verdicts. Moreover, the prosecutor's statement constituted fair comment on [Petitioner's] inculpatory statements, his correspondence to the victims, and his alleged history of molestation as a child. The prosecutor's statements did not involve the use of deceptive or reprehensible methods to attempt to persuade the jury and did not irreparably damage [Petitioner's] chances of receiving a fair trial.
>
> In sum, there was not a reasonable likelihood the jury construed the challenged remarks in an objectionable fashion and the trial court properly denied the motion for

1  mistrial.

2 See Lodged Doc. No. 4 at 24-25.

3   A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987), *quoting* United States v. Bagley, 473 U.S. 667 (1985). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). "Improper argument does not, per se, violate a defendant's constitutional rights." Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996), *quoting* Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless.").

   The state court's determination was not contrary to or an unreasonable application of the above standard. The prosecutor's comments were not made as an appeal to the jury to find Petitioner guilty based on his need to obtain help for a mental illness. Rather, the prosecutor merely emphasized the fact that punishment was not to be considered by the jury, which is exactly what the jury was instructed pursuant to CALJIC No. 17.42. In addition, the prosecutor's comments were fair comment on the evidence. As noted above, the record showed Petitioner requested aid from the detective with his alleged sickness which was caused by molestation as a child. The prosecutor only reemphasized that any kind of help with a perceived illness was not to be considered by the jury. The prosecutor's statements were not misconduct. Accordingly, the claim should be denied.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **January 17, 2008**              /s/ **Gary S. Austin**
                                     UNITED STATES MAGISTRATE JUDGE